In re NEW ERA PACKAGING,
INC., Debtor.

David J. FERRARI, Chapter
11 Trustee, Plaintiff,

v.

FAMILY MUTUAL SAVINGS
BANK, Defendant.

Bankruptcy No. 94–41284.
Adv. No. 94–4188.

United States Bankruptcy Court,
D. Massachusetts.

Sept. 22, 1995.

David J. Ferrari, Chapter 11 Trustee.

Douglas R. Gooding, Boston, MA, for Family Mutual Savings Bank.

## MEMORANDUM

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is a "Motion by Trustee for Judgment on Pleadings for Equitable Subordination of Redemption Claim" (the "Motion") filed by the Chapter 11 Trustee, David J. Ferrari (the "Trustee") against the defendant Family Mutual Savings Bank ("Family Mutual"). Through the Motion, the Trustee seeks entry of judgment on Count II of his Complaint for equitable subordination of the claims of Leonard J. Goodman ("Leonard"), Elaine B. Goodman ("Elaine") and Laura J. Goodman ("Laura") (collectively, the "Goodmans") now held by Family Mutual and arising from the Debtor's alleged redemption of its stock from the Goodmans.[1]

## I. BACKGROUND

On December 31, 1986, the Debtor, then named "Eddie Goodman Co., Inc." entered into an agreement (the "Stock Redemption Agreement") to redeem approximately one

---

**1.** The Trustee commenced this adversary proceeding against Leonard, Elaine, Laura and Congress Financial Corporation ("Congress") in order to determine the extent and priority of alleged liens held by Leonard, Elaine, Laura and Congress on certain assets of the Debtor. As is further detailed below, Family Mutual Savings Bank was subsequently assigned the claims of Leonard, Elaine and Laura Goodman. Congress' claim was subsequently settled and Congress was dismissed as a defendant.

hundred and eighty-four (184) shares of stock [2] owned by Leonard, Elaine and Laura. The Stock Redemption Agreement provided:

The [Debtor] will accept the surrender of the shares of the [Goodmans] for redemption and will pay for such shares as hereinafter provided in Article 2.0. . . .

As consideration for the redemption, the [Debtor] shall pay to the [Goodmans] for all of their shares of stock a total of one million dollars ($1,000,000) at the closing as follows:

Two hundred and Fifty Thousand Dollars ($250,000) shall be paid at the Closing by delivering to the [Goodmans] or their nominee a Quitclaim Deed for the real estate located at 25 Bond Street, Haverhill . . . subject to outstanding mortgages and other encumbrances totalling approximately one million five hundred thousand dollars ($1,500,000) which the [Goodmans] shall assume and agree to pay.

Five hundred thousand dollars ($500,000) shall be paid at the Closing by delivery of a Promissory Note in the amount of five hundred thousand dollars ($500,000) with interest[.] . . .

The Promissory Notes shall be guaranteed by the [Goodmans].[3]

As contemplated by the Stock Redemption Agreement, on December 31, 1986, the Debtor executed a promissory note (the "Note") [4] in the amount of $500,000 and a Security Agreement (the "Security Agreement") in favor of the Goodmans. The collateral subject to the Security Agreement included "all goods" then existing or thereafter acquired, including machinery, equipment, furniture, fixtures, inventory, accounts receivable and contract rights.

There were other important provisions of the Stock Redemption Agreement. First, it provided for an adjustment in the redemption price depending on the amount of uncollectible accounts receivable remaining on the books of the Debtor (then named Eddie Goodman Co., Inc.) as of July 30, 1987. Second, it provided that the Goodmans would indemnify and hold the Debtor harmless for certain liabilities, including tax liabilities arising prior to December 31, 1986 and for certain undisclosed liabilities. Third, it provided:

[t]his agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous agreements and understandings in connection therewith. This Agreement may be amended, modified, waived or revoked only by a written instrument executed by both parties hereto.

On April 12, 1989, the Debtor changed its name from "Eddie Goodman Co., Inc." to "New Era Packaging, Inc." by filing Articles of Amendment with the Office of the Massachusetts Secretary of State.

On December 21, 1992, Congress and the Debtor entered into an Accounts Financing Agreement, dated December 21, 1992, Covenants Supplement to Accounts Financing Agreement, and Letter Agreement regarding inventory loans, and Inventory and Equipment Security Agreement Supplement (collectively, the "Congress Financing Agreements"), pursuant to which Congress provided the Debtor with a revolving line of credit. Elaine and Laura also entered into a Subordination Agreement (the "Subordination Agreement") with Congress, in which Elaine and Laura agreed that their liens in the Debtor's assets be subordinated to Congress' liens under the Congress Financing Agreements. On December 21, 1992, the Debtor executed a new promissory note (the "New Note") in the amount of $137,310.34 and a new Security Agreement (the "New Security Agreement") in favor of Elaine and Laura, evidencing and securing the Debtor's remain-

---

2. At the time of the agreement, there were approximately two hundred (200) shares of outstanding stock.

3. Although the Stock Redemption Agreement does not expressly so state, both parties appear to agree that an additional $250,000 was to be paid by the Debtor in cash at the Closing.

4. Approximately $87,000 remains outstanding on the Note. Pursuant to the Court's order approving the Debtor's Borrowing Stipulation with Congress, that $87,000 is segregated in an escrow account held by the Debtor's counsel pending the outcome of this proceeding.

ing indebtedness to Elaine and Laura under the Note.

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 25, 1994. On March 30, 1994, upon a motion filed by the United States Trustee, this Court ordered the appointment of a Chapter 11 Trustee. David J. Ferrari, Esq. was subsequently appointed as the Chapter 11 Trustee.

On May 24, 1994, the Trustee filed the instant Complaint through which he seeks a determination that (1) the Goodmans' alleged liens are inferior to the Trustee's rights as a hypothetical lien creditor pursuant to 11 U.S.C. § 544(a) (Count I), and (2) the Goodmans' claims be equitably subordinated and any liens securing their claims be transferred to the estate pursuant to 11 U.S.C. § 510(c) (Count II).

The originally named defendants were Leonard, Elaine, Laura and Congress[5]. Approximately six (6) months later on November 22, 1994, this Court allowed a motion for the substitution of Family Mutual as defendant in the place of Elaine and Laura. Shortly thereafter, on December 1, 1994, Leonard assigned to Family Mutual, among other things, any and all of Leonard's right, title and interest in and to:

(1) the Note in the original principal amount of $500,000 dated December 31, 1986, from Eddie Goodman Co., Inc. to Leonard J. Goodman, Elaine B. Goodman and Laura G. Goodman; and

(2) any and all security agreements and security interests which have been granted as security for repayment of the Note.

Family Mutual, as assignee of the interests of Leonard, is the real party defendant in this adversary proceeding.[6]

The instant Motion for Judgment on the Pleadings by the Trustee relates to Count II.

Family Mutual filed an opposition to the Motion, together with an affidavit of Edward M. Goodman. After a hearing, the Court took the Motion under advisement and ordered the parties to file briefs.[7]

## II. ARGUMENTS OF THE PARTIES

The Trustee's argument is in two parts. The Trustee first asserts that the claims of Leonard, Elaine and Laura against the Debtor arise solely from the Debtor's redemption of its stock pursuant to the Stock Redemption Agreement. In support of his argument, the Trustee notes that the Stock Redemption Agreement is a fully integrated agreement and expressly and unambiguously provides for the Debtor's redemption of its stock. The Trustee points specifically to the integration clause which expressly disclaims the existence of any prior or contemporaneous agreements executed relative to the Stock Redemption Agreement. The Trustee then goes on to argue that the claims of Leonard, Elaine and Laura, arising from the redemption of stock pursuant to the Stock Redemption Agreement, should be equitably subordinated to the claims of unsecured creditors in accordance with applicable case law. See e.g., In re SPM Manufacturing Corp., 163 B.R. 411, 414 (Bankr.D.Mass.1994).

Family Mutual argues that the issue of whether the Stock Redemption Agreement is fully integrated is a question of fact, and therefore, would necessarily preclude entry of judgment on the pleadings. Family Mutual claims that the Stock Redemption Agreement is not a fully integrated agreement for the reason that it was only part of a larger transfer of the entire business of the Debtor (then named Eddie Goodman Co., Inc.) in order to facilitate a merger. It points to various provisions of the Stock Redemption Agreement, namely, the provisions providing for indemnifications, mutual releases, and an

**5.** The Claims of defendant Congress against the Debtor were satisfied and Congress has been dismissed from this adversary proceeding.

**6.** After the execution of the Assignment Agreement, Family Mutual moved for an order seeking that it be substituted as defendant in place of Leonard. Although the Court had inadvertently failed to rule on this motion, it has treated Family Mutual as the only and real party defendant

for purposes of the instant Motion for Judgment on the Pleadings. To clarify the docket, the Court hereby allows the motion for substitution.

**7.** After the Motion for Judgment on the Pleadings was taken under advisement, Family Mutual was granted leave to file a supplemental affidavit of Edward M. Goodman.

adjustment in the redemption price for uncollectible accounts receivable. It also offers the affidavits[8] of Edward M. Goodman purporting to show that the Stock Redemption Agreement contemplated, in a larger sense, more than a stock redemption. It claims that, in fact, the transaction was a sale of assets as a precondition to a merger with another company. However, in the event that the Court determines that the agreement was in the nature of a stock redemption agreement, Family Mutual argues also that the Goodmans' claims should not be equitably subordinated as a matter of law.

## III. *DISCUSSION*

Rule 12(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings pursuant to Bankruptcy Rule 7012(b), provides:

> After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). The Trustee alleges that the pleadings in this adversary proceeding reveal that there is no factual dispute *material* to the Trustee's request for equitable subordination of the redemption debt. Family Mutual argues that there is a material factual issue as to whether the Stock Redemption Agreement was a fully integrated

contract. This factual dispute, Family Mutual argues, would preclude entry of judgment on the pleadings.

The Court, therefore, must first determine whether or not the Stock Redemption Agreement was a fully integrated agreement.

### A. Integration

■ The Trustee argues that the Stock Redemption Agreement expressly and unambiguously provides for the Debtor's redemption of stock. In response to Family Mutual's argument that the issue of integration is a factual issue not properly decided on the pleadings, the Trustee asserts that Family Mutual has impermissibly attempted to create a factual dispute by introducing the affidavits of Edward M. Goodman. The Trustee argues that the parole evidence rule precludes Family Mutual from introducing extrinsic evidence to contradict or modify the terms of the contract.

Family Mutual argues that the parole evidence rule is not applicable *until* the Court makes a preliminary determination that the agreement is integrated. It contends that the question of integration is a factual determination, and therefore, not ripe for determination on a motion to dismiss (or summary judgment). Family Mutual maintains that it can offer the affidavits of Edward M. Goodman for the purpose of providing the Court with background information pertinent to the context in which the Stock Redemption Agreement was made.

■ Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accor-

---

**8.** Through the affidavits, Edward M. Goodman states in part:

> In 1986, Andrew and I wanted to merge the businesses of Eddie Goodman Co., Inc. and Corporate Designs, Inc.[.] ... At that time, Andrew was President of Corporate Designs Inc. and would have absolutely no dealings with my father. Since Andrew would not agree to the merger if Leonard remained involved in Eddie Goodman Co., Inc., the only way to effectuate the merger of the two companies was to remove Leonard completely from Eddie Goodman Co., Inc. Therefore, Leonard decided to sell the entire business of Eddie Goodman Co., Inc. to Andrew and me as a

> precondition to the merger of Eddie Goodman Co., Inc. and Corporate Designs, Inc. Leonard structured the sale of the business to Andrew and me as a stock redemption agreement because that appeared to be the most efficient way to effectuate the sale.... Following the sale of Eddie Goodman Co., Inc. to Andrew and me, Leonard, Elaine and Laura held no interest in the company and were not involved with the operation of the company in any respect. Andrew and I understood the transaction to be a purchase of the assets of Eddie Goodman, Inc., including, without limitation, a purchase of the company's inventory, machinery, equipment, and accounts receivable.

dance with all relevant evidence. *Restatement (Second) of Contracts* § 209 cmt. c. (1979). *See Rokowsky v. Gordon,* 501 F.Supp. 1114, 1121 (D.Mass.1980); *Caputo v. Continental Construction Corp.,* 340 Mass. 15, 18, 162 N.E.2d 813, 816 (1959). However, the determination of whether an agreement is integrated is determined by the court as a question preliminary to an interpretative ruling or to the application of the parole evidence rule. *Restatement (Second) of Contracts* § 209.

■■■■ The propriety of considering extrinsic facts to show terms of a contract other than those which have been reduced to writing depends on whether the writing was intended by the parties to embody the entire transaction, so as to constitute the sole evidence of their agreement. 17A Am.Jur.2d *Contracts* § 398 (1991). If the parties evidence an intention in the written contract itself that the agreement should be treated as fully integrated, extrinsic evidence may not be considered. *Id.*

■■■■ Massachusetts [9] law provides:

[w]here the writing shows on its face that it is the entire agreement of the parties and 'comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending to be a complete and final statement of the whole transaction.'

*Bendetson v. Hamilton Coolidge,* 7 Mass. App.Ct. 798, 802–03, 390 N.E.2d 1124, 1127 (1979), *citing, Glackin v. Bennett,* 226 Mass. 316, 319–320, 115 N.E. 490, 491 (1917). *See Robert Industries, Inc. v. Spence,* 362 Mass.

751, 754, 291 N.E.2d 407, 409 (1973); *Gifford v. Gifford,* 354 Mass. 247, 249, 236 N.E.2d 892, 893 (1968); *Berman v. Geller,* 325 Mass. 377, 379–80, 90 N.E.2d 843, 845 (1950). The presumption of integration, however, does not apply where the writing is manifestly fragmentary or is intended to be only a partial integration or is ambiguous. 17A Am.Jur.2d *Contracts* § 398. In the instant case, the Stock Redemption Agreement actually contains an integration clause—that is, a statement of intention that the writing embodies the entire or complete agreement of the parties. Furthermore, the Stock Redemption Agreement clearly and unambiguously provides for the redemption of stock. Under Massachusetts law, the interpretation of unambiguous language in a written contract is a question of law for the court. *See Edwin R. Sage Co. v. Foley,* 12 Mass.App.Ct. 20, 28, 421 N.E.2d 460, 465 (1981). And, the words of an unambiguous contract should be interpreted by the court in accordance with their ordinary and usual sense. *See id.* The Stock Redemption Agreement does not suffer from any ambiguity which would justify disregarding its integration clause. *See id.,* 12 Mass.App.Ct. at 27, 421 N.E.2d at 464. Where a contract is neither ambiguous, uncertain or equivocal, the parole evidence rule prohibits extrinsic evidence. *Boston Car Co. v. Acura Auto Div., Am. Honda Motor Co.,* 971 F.2d 811, 815 (1st Cir.1992); *ITT Corp. v. LTX Corp.,* 926 F.2d 1258, 1261 (1st Cir. 1991); *Keating v. Stadium Management Corp.,* 24 Mass.App.Ct. 246, 249–50, 508 N.E.2d 121, 123, *review denied,* 400 Mass. 1104, 511 N.E.2d 620 (1987). Therefore, the Court will not consider the affidavits of Edward M. Goodman.[10]

---

9. The Stock Redemption Agreement provides that "[t]his agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." Under Massachusetts choice of law principles, Massachusetts law governs the interpretation of the Stock Redemption Agreement.

10. Even if the Court were to consider the affidavits of Edward M. Goodman, the affidavits would make no material change. They do not seek to dispute the validity of the Stock Redemption Agreement as a whole. *See Shain Investment Co., Inc. v. Cohen,* 15 Mass.App.Ct. 4, 13, 443 N.E.2d 126, 132 (1982). Nor do they seek to

show either mistake as to the meaning of words used or that the parties misapprehended the contract. *See Id.* Instead, the affidavits attempt to recharacterize the technical structure of the transaction described in the Stock Redemption Agreement. However, regardless of how the elements of the transaction are recharacterized, the source of the claim now held by Family Mutual is the same. That claim constitutes the proceeds of the liquidation of equity interests held by stockholders of the Debtor, and, in this aspect, would not be materially different from a claim arising from a stock redemption agreement.

Accordingly, the Court finds that the Stock Redemption Agreement is a fully integrated agreement, and therefore, the claim held by Family Mutual arises from the redemption of stock or equity interests held by the Goodmans.

## B. Equitable Subordination

■ In Count II of the Complaint under consideration here, the Trustee requests subordination of the Goodmans' claim, pursuant to § 510(c), under the principles of equitable subordination. The Trustee relies solely on the fact that the claim arises from redemption of the Debtor's stock. The Trustee asserts no inequitable conduct on the part of the Goodmans. Nor, in this Count, does the Trustee allege that the redemption was voidable as a fraudulent transfer or that it failed to comply with Massachusetts corporate law.

Section 510(c) provides that "the court may ... under the principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim[.]" 11 U.S.C. § 510(c). The Bankruptcy Code does not define "under the principles of equitable subordination." *Envirodyne Industries, Inc. v. American Express (In re Envirodyne Industries, Inc.)*, 176 B.R. 825 (Bankr.N.D.Ill. 1995). The legislative history provides in part that:

> [t]his section is intended to codify caselaw, such as *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and *Taylor v. Standard Gas and Electric Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) and is not intended to limit the court's power in any way. The bankruptcy court will remain a court of equity[.] ... Nor does this subsection preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances.... The court's power is broader than the general doctrine of equitable subordination, and encompasses subordination on any equitable grounds.

H.Rep. No. 595, 95th Cong., 1st Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963,

6315. While the legislative history states that a bankruptcy court is authorized to subordinate a claim by reason of the claimant's misconduct under the facts in the *Pepper* and *Taylor* cases, it also suggests that a bankruptcy court's power to subordinate a claim on equitable grounds is more extensive. *SPM Manufacturing Corp.,* 163 B.R. at 414.

The seminal case on equitable subordination is *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977). The court in *Mobile Steel* established three conditions which must be satisfied before a claim can be equitably subordinated: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.[11] *Id.* at 699–700. The vast majority of courts have followed the so-called *Mobile Steel* test. *See e.g., Matter of Herby's Foods, Inc.,* 2 F.3d 128 (5th Cir. 1993); *First National Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Servs, Inc.),* 974 F.2d 712 (6th Cir.1992); *In re Vitreous Steel Products Co.,* 911 F.2d 1223 (7th Cir.1990); *Allied Eastern States Maintenance Corp. v. Miller (In re Lemco Gypsum Inc.),* 911 F.2d 1553 (11th Cir.1990), *rehearing denied,* 930 F.2d 925 (11th Cir. 1991); *In re Daugherty Coal Co., Inc.,* 144 B.R. 320 (N.D.W.Va.1992). *In re Badger Freightways, Inc.,* 106 B.R. 971 (Bankr. N.D.Ill.1989); *In re Sepco, Inc.,* 36 B.R. 279, 287 (Bankr.D.S.D.1984).

■ Recent decisions have moved beyond *Mobile Steel* and used § 510(c) to equitably subordinate both tax penalty claims and claims originating from a stock redemption, despite the absence of any wrongdoing on the part of such claimants. *See Burden v. United States (In re Burden),* 917 F.2d 115, 116–18 (3rd Cir.1990); *Schultz Broadway Inn v. United States,* 912 F.2d 230, 232 (8th Cir.1990); *Virtual Network Servs. Corp. v. United States (In re Virtual Network Services Corp.),* 98 B.R. 343 (N.D.Ill.1989), *aff'd*

---

11. The third prong may be moot given the 1978 enactment of the Bankruptcy Code equitable subordination provision, § 510(c). *In re Hyperion*

*Enterprises, Inc.,* 158 B.R. 555, 560 n. 1 (D.R.I. 1993).

902 F.2d 1246, 1249–50 (7th Cir.1990); *SPM Manufacturing, Inc.*, 163 B.R. 411. This commonly referred to "no fault equitable subordination" test looks to the nature or origin of the claim. *See Envirodyne Industries, Corp.*, 176 B.R. at 831.

*SPM* is the leading case in this District on the effect of § 510(c) on stock redemption claims. In the *SPM* case, the Creditors' Committee objected to a redemption claim filed by a charitable trust controlled by the Chapter 7 debtor's stockholder, directors and officers. The court addressed the question of whether a redemption claim may be subordinated to the claims of other general unsecured creditors, absent a showing of misconduct by the claimant.

Examining the legislative history of § 510(c) and the rationale of tax claim cases, the court concluded that Congress intended the further development of the equitable subordination doctrine and to extend it to claims based on their nature or origin. 163 B.R. at 414. The court further reasoned that redemption claims were similar to damage claims arising from stock purchase, which are expressly subordinated in section 510(b). *Id.* at 415–16. The *SPM* court found "more reason" for subordination of stock redemption claims than damage claims arising from stock purchase because while damage claimants only seek to recover the cost of their investment, stock redemption claimants typically seek profit in the sale of stock or recovery of what is essentially a liquidating dividend. *Id.* at 416.

Family Mutual argues that the *SPM* decision departs from established First Circuit precedent. This Court disagrees. The analysis set forth in the *SPM* decision is consistent with the principles announced in the decision of *Liebowitz v. Columbia Packing Co.*, 56 B.R. 222 (D.Mass.1985), *aff'd*, 802 F.2d 439 (1st Cir.1986). *Liebowitz* involved claims by the estates of officers who had entered into stock redemption agreements with the other stockholders of the company. The agreements provided that upon the death of one of the stockholders, the company would purchase the shares of the decedent stockholders from the estate at a predetermined price. The purchases were funded mainly from life insurance policies that the company held on the deceased stockholders.

The *Liebowitz* court subordinated the redemption debt. The court stated:

> When a stockholder sells his stock to a corporation and receives cash and a promissory note from the corporation in return, that stockholder does not thereby become a debt creditor who stands on equal footing with trade or general creditors should the corporation become bankrupt. The underlying nature of the transaction survives, and the note remains an equity obligation. A stockholder who accepts a note in payment for his stock assumes the risk that the corporation will be solvent when the note becomes due.

56 B.R. at 224 (citations omitted). The court also emphasized that "it is immaterial that [the debtor] was solvent when it purchased the stock from [the claimant] and that the repurchase [a]greement was made in good faith." In an early First Circuit decision, *Matthews Bros. v. Pullen*, the court held that "a stockholder cannot through an executory contract cease to be a stockholder, and become a creditor, to share in competition with other creditors in the assets of the corporation when bankrupt." 268 F. 827, 828 (1st Cir.1920). *See also Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir.1935) (redemption is merely a method for a corporation to make a distribution to a stockholder with the corporation acquiring nothing of value in return).

This Court finds itself persuaded by the analysis and reasoning of *SPM*. The Court admits that, in certain cases, some unfairness may result to the stockholder who redeems stock at a time of a company's substantial solvency and finds at the time for deferred payment that the company is insolvent through no fault of the stockholder. But juxtaposed against that unfortunate result is the recognition that, at the outset of the redemption transaction, the company became obligated to the stockholder, but received nothing in return. The burden of payment should not, therefore, fall on the shoulders of the company's creditors who parted with value for the company's benefit.

The Court finds and rules that Family Mutual's claims, arising from the Debtor's redemption of stock to the Goodmans, should be equitably subordinated to the claims of general unsecured creditors under § 510(c) as a matter of law.

Accordingly, the Trustee's Motion for Judgment on the Pleadings is granted. The Court hereby enters judgment in favor of the Trustee on Count II of the Complaint.

A separate shall issue in conformity with this memorandum of decision.